IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CASSIE LEA BAKER AND BAILEY EUGENE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES OF K.B.B., DECEASED MINOR, | § § § § § | |
| Plaintiffs, | § § | |
| V. | § § | CIVIL ACTION NO.: 3:09-cv-00787-B |
| BNSF RAILWAY COMPANY, NATIONAL RAILROAD PASSENGER CORPORATION, AND VELIDA J. BREAKFIELD, | § § § § § | JURY |
| Defendants. | § § | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES JUDGE FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION:

NOW COME Defendants BNSF RAILWAY COMPANY F/K/A BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY ("BNSF"), NATIONAL RAILROAD PASSENGER CORPORATION D/B/A AMTRAK ("Amtrak") and VELIDA J. BREAKFIELD F/K/A VELIDA J. MORGAN ("Morgan"), and file this Brief in Support of Defendants' Motion for Summary Judgment, and request that the court grant Defendants' Motion for Summary Judgment on Defendants' affirmative defenses and on every claim alleged by Plaintiffs.

## INTRODUCTION

Plaintiffs Cassie Lea Baker and Eugene Bailey Baker, Individually and as Personal Representatives of the Estate of K.B.B., Deceased Minor, filed this wrongful death and survival suit against BNSF, Amtrak and Morgan for damages and injuries arising from an automobile-train collision, in which Plaintiffs' fifteen year-old daughter sustained fatal injuries. Plaintiffs claim that BNSF's, Amtrak's and Morgan's breach of the following common law duties caused their daughter's death: (1) the duty to properly inspect and maintain the subject crossing; (2) the duty to warn; and (3) the duty to slow the train for a specific individual hazard. Plaintiffs also claim

that BNSF and Amtrak breached their duty to adequately train their employees. Defendants assert the affirmative defenses of preemption and contributory negligence. Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for an order granting Defendants' summary judgment on each and every claim alleged by Plaintiffs, because there is no genuine issue as to any material fact, and further because Defendants can establish each element of its preemption and contributory negligence defenses as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants submit this statement of undisputed material facts for purposes of this Motion for Summary Judgment.

1. On Sunday, May 11, 2008, Amtrak Train 22 operated north from San Antonio, Texas, toward Chicago, Illinois. The train consisted of one locomotive and eight cars. (App. 55-66).

2. When the train departed Austin, Texas, and traveled north toward Fort Worth, Texas, the train operating crew consisted of Engineer Morgan and Conductor G.L. Brown, although Engineer Morgan was the only person in the locomotive. (App. 45-66; App. 55-66).

3. Automated flashing signals and gates existed on the east and west sides of the Cleburne Whitney Road highway-rail grade crossing DOT No. 023161K, located at railroad milepost 309.94 in Rio Vista, Johnson County, Texas, at the time of the subject incident. (App. 1-71)

4. BNSF owned and maintained this crossing at the time of the subject incident. (App. 67-76).

5. Immediately prior to the incident, K.B.B. operated a 2003 Chevrolet Trailblazer westbound on Cleburne Whitney Road toward the Rio Vista Food Center to purchase food for a dinner. (App. 126-132).

6. K.B.B. possessed a Texas hardship license at this time. (App. 126-146).

7. K.B.B.'s hardship license restricted her driving to Mondays through Fridays, 7:15 a.m. to 3:45 p.m. (App. 146).

8. Plaintiff Cassie Baker was aware that K.B.B. operated the motor vehicle alone in violation of the hardship license restrictions. Further, Plaintiff Cassie Baker authorized K.B.B. to do so on the day of the incident. (App. 126-139).

9. Engineer Morgan properly sounded the train's audible whistle and bell beginning approximately 1,664 feet and fifteen seconds south of the subject crossing and continued to sound the whistle and horn until the locomotive occupied the subject crossing. (App. 45-66). This application of the locomotive's horn/bell complied with 49 CFR 222.21. (App. 55-66, 77-92).

10. The train's headlight and ditch lights were properly illuminated as the train approached the crossing. (App. 45-66).

11. The Amtrak train was traveling at approximately 75 miles per hour immediately prior to the collision. No slow order had been issued for the Cleburne Whitney Road crossing area. The train's speed complied with the BNSF timetable speed limit of 79 miles per hour for a passenger train at this location, and was below the federally mandated speed limit for operation on Class 4 track (80 miles per hour maximum passenger train speed per 49 CFR Part 213.9(a)). (App. 55-66).

12. Yellow advance warning signs located along the southbound side of Tower Road and the westbound side of Cleburne Whitney Road alerted motorists of the presence of a railroad crossing. (App. 34-44, 67-71).

13. No vegetation or other visibility obstruction existed at the crossing or along the railroad right of way on the date and at the time of the incident that would have impaired the ability of a motorist lawfully stopped at the activated warnings signals to see the approach of the subject train. (App. 34-54, 67-71).

14. K.B.B. operated the 2003 Chevrolet Trailblazer westbound toward the Ceburne Whitney Road crossing as the train approached the crossing. (App. 45-54).

15. K.B.B. proceeded around the activated horizontal gate and into the path of the approaching train. (App. 45-54).

16. Engineer Morgan initially believed that the automobile would be able to clear the train's path prior to the collision. (App. 77-92). The train was approximately 400 to 500 feet and about 3-4 seconds south of the crossing when Engineer Morgan concluded that a collision was imminent, and she therefore applied the train's brakes. (App. 55-66, 77-92). Even had Engineer Morgan placed the train's brakes in emergency at 600-800 feet and 6-8 seconds south of reaching the crossing, when K.B.B. clearly had ample opportunity to get out of the way, the train's delay at arriving at the crossing would have been less than one second and the speed would still have been over 70 mph at impact. (App. 55-66).

17. The automobile did not clear the train's path before the train reached the crossing, resulting in a collision.

18. K.B.B. sustained fatal injuries from the collision.

19. The damage to the subject automobile is consistent with the train impacting the automobile from the rear. (App. 34-54, 126-129).

20. In order to have stopped the train completely prior to reaching the Cleburne Whitney Road crossing, Engineer Morgan would have had to apply the train's emergency brake approximately seventeen seconds and 1,900 feet south of the subject crossing, which would have been before Engineer Morgan had seen the Trailblazer. (App. 55-66). Engineer Morgan first saw the vehicle when the train was near the whistleboard, about 1,300 feet south of the crossing. (App. 77-92).

21. In 1988, the Cleburne Whitney Road crossing was designated in TXDOT's Project No. RRP 0000S(705) to participate in the 1988 Federal Railroad Signal Program, which would install automated crossing gates and new signal flashers at the crossing. (App. 1-33).

22. The project participation breakdown of funding for these additions and upgrades to the subject crossing was 90 percent federal funds. (App. 1-33).

23. TXDOT summarized the approved estimated the total costs of this crossing upgrade, including TXDOT's upgrades to pavement markings, advance warning signs, crossing approaches, at $106,600.00. The project would receive 90 percent funding from the federal government, totaling $95,940.00. The State of Texas would provide approximately 5 percent of the total cost, totaling $6,160.00. BNSF would fund approximately 5 percent, totaling $4,500.00. (App. 1-33).

24. The proposed 1988 federal crossing upgrade indicates that automated gate arms would be installed, as well as four new flashing signals east of the tracks and four new flashing signals west of the tracks. Bells would be installed at each of the signals as well. (App. 1-33).

25. The proposed crossing upgrade was completed by BNSF and TXDOT and placed in service on January 26, 1990. (App. 1-33).

26. The federally funded automated gates and flashers installed in 1990 have since been maintained by BNSF, and were maintained by BNSF, at the time of the May 11, 2008 accident. (App. 67-71).

27. These federally funded gates and flashers existed at the subject crossing on May 11, 2008. (App. 34-44).

28. These federally funded gates and flashers properly activated prior to and at the time of the subject incident in excess of the minimum time required. (App. 45-125, 154-159).

## APPLICATION OF LAW

Summary Judgment on Defendants' affirmative defenses of preemption and contributory negligence should be granted because there is no genuine issue of material fact and Defendants can conclusively prove each defense. Summary Judgment is further appropriate as to each of Plaintiffs' claim because there is no genuine issue of material fact and Defendants are entitled to summary judgment as a matter of law.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is an integral part of the Federal Rules, which are designed to secure the just, speedy and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Summary judgment is granted where pleadings, depositions, and answers to interrogatories on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant carries its burden under the rule, the non-movant must do more than simply show that there is some metaphysical doubt as to the material facts.

*Matsushita Elec. Industrial Co. v. Zenith,* 475 U.S. 574, 586-587 (1986). The non-movant may not rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Dunn v. State Farm & Casualty Co.,* 927 F.2d 869, 872 (5th Cir. 1991). If the non-movant fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322.

Similarly, where a defendant moves for summary judgment on its affirmative defense, it must show the absence of a genuine issue of material fact and establish each element of its defense as a matter of law. *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.—1995). Once defendant meets its burden, plaintiff must then produce significant probative evidence demonstrating the existence of a triable issue of fact on at least one element of the defendant's defense. *Kansa Reinsurance Co. v. Congressional Mortg. Corp.,* 20 F.3d 1362, 1371 (5th Cir. 1994).

A material fact is one that constitutes an element that is essential to a party's case. *Celotex,* 477 U.S. at 322-23. While the movant must show the absence of a genuine issue of material fact, the non-movant bears the burden of establishing the existence of a genuine issue of material fact. *Matsushita,* 475 U.S. at 585-87. The non-movant must present significantly probative evidence to establish a fact issue—more than a "mere scintilla," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986), more than "merely colorable," *Celotex* at 327, and more than "some metaphysical doubt." *Matsushita,* 475 U.S. at 586. A court should not adopt a version of the facts that is blatantly contradicted by the record. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

II.     **THE FEDERAL RAILROAD SAFETY ACT PREEMPTS PLAINTIFFS' CLAIMS**

Plaintiffs claim that BNSF, Amtrak and Morgan breached the following common law duties: (1) the duty to properly inspect and maintain the subject crossing; (2) the duty to warn; and (3) the duty to slow the train for a specific individual hazard. Plaintiffs also claim that BNSF and Amtrak breached their duty to adequately train their employees. However, each of these claims is preempted by federal law because Defendants complied with the respective federal regulations at the time of the incident.

A.     **Federal preemption is a question of law properly resolved by summary judgment.**

Federal preemption is purely a question of law and therefore properly resolved by summary judgment. *Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 552 (5th Cir. 2001). Via the Supremacy Clause (U.S. Const. art. VI, cl. 2.), state laws are preempted when they conflict with or frustrate federal law. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663 (1993); *Norfolk Southern Railway v. Shanklin,* 529 U.S. 344, 352-53 (2000). In *Easterwood* and *Shanklin*, the United States Supreme Court held that when the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.*, "covers" the subject matter, federal preemption of the state statutory and tort law occurs. *Easterwood,* 507 U.S. at 664; *Shanklin,* 529 U.S. at 352.

FRSA declares a federal policy that "[l]aws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1) (2007). When enacted, Congress sought to improve the nation's record on rail safety by replacing the patchwork of state regulation with national safety standards. "The committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems." H.R. Rep. No. 91-1194, *reprinted in* 1970 U.S.C.C.A.N. 4104, 4110. To implement the federal scheme, Congress vested the Secretary of Transportation with authority to promulgate regulations in "every area of railroad safety," 49 U.S.C. § 20103(a); H.R. Rep. No. 91-1194, *reprinted in* 1970 U.S.C.C.A.N. at 4114. Federal preemption was an integral part of this scheme.

Congress expressly preempted all state law once the Secretary had adopted a rule "covering the subject matter." 49 U.S.C. § 20106(a)(2). The States nevertheless are permitted to regulate an "essentially local safety or security hazard." *See* 49 U.S.C. § 20106(a)(2).

Of relevance to this lawsuit, the Secretary promulgated regulations that cover crossing inspection and maintenance, warnings, speed, and training. Congress made quite clear that it did not want railroads to be subject to state-by state requirements based on what each State thought should be the applicable safety standard. Rather, Congress deliberately chose to put in place a national solution to a national problem. As explained in the 1970 legislative history, "[t]he unanimous recommendation was that broad Federal regulatory authority over all areas of railroad safety be enacted." Congress H.R. Rep. No. 91-1194, *reprinted in* 1970 U.S.C.C.A.N. at 4108. Congress recognized that "the railroad industry has few local characteristics" and "it has a truly interstate character calling for a uniform body of regulation and enforcement." *Id.* at 4110. "To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce." *Id.* 4110-11. What Plaintiff proposes – allowing states to impose additional obligations under their common law via a jury verdict – would effectively eviscerate that solution.

### B.    Defendants' compliance with federal regulations preempts Plaintiffs' failure to inspect and maintain the crossing.

When federal funds participate in the installation of the automated gates and lights at a crossing, claims related to signage, signalization, warnings and "hazardous conditions" are preempted. Plaintiffs' claim is preempted because it attempts to impose a greater duty upon Defendants in regard to a general condition at a crossing that is fully subsumed by both federal and state law. Even if these claims were not preempted, Plaintiffs present no evidence that any of Defendants' alleged failures to inspect and maintain the crossing proximately caused K.B.B.'s death and Plaintiffs' subsequent damages.

### 1.   BNSF complied with its duty to maintain and inspect the crossing.

Plaintiffs alleged the following in their first Amended Original Petition that BNSF: (1) "failed to maintain the railroad crossing in a safe condition," (2) "failed to provide necessary and proper procedures," (3) "compelled Katelan Bailey Baker into entering the unsafe and dangerous crossing," (4) "failed to properly inspect the crossing and take reasonable precautions to prevent individuals from placing themselves in harm's way," (5) "failed to perform inspections and testing of the warning system or crossing," (6) "failed to take precautions necessary to alleviate the hazards of the dangerous trap presented by the crossing, when they knew or should have known of the crossing's dangerous nature," (7) "failed to provide an adequate and unobstructed sight distance at its crossing," (8) "created and maintained an extrahazardous railroad crossing at BNSF crossing #023161K," (9) "failed to use due care to test and/or inspect the crossing or components parts thereof to determine its durability and function ability for the purpose for which it was intended," and (10) "failed to take any corrective action to prevent a recurrence" of prior similar events.

Each of these allegations specifically pertains to BNSF's duty to properly maintain and inspect the crossing. However, negligent maintenance and inspection claims are completely preempted by federal law. The numerous specified regulations in 49 C.F.R. Part 213 cumulatively and comprehensively address the subject matter of track maintenance and repair. In *Williams v. Amtrak*, the United States District Court for the Southern District of Illinois squarely addressed this issue:

> The Secretary has, however, adopted numerous regulations covering the safety of railroad tracks by outlining the proper size, alignment curvature, elevation, and maintenance of the tracks and their components. *See, e.g.,* 49 C.F.R. § 213.53 (prescribing track gage and maintenance); § 213.55 (prescribing track alignment); § 213.57 (prescribing track curvature and maintenance); § 213.59 (prescribing track curve elevation and maintenance); § 213.63 (prescribing track surface and maintenance); § 213.103 (prescribing ballast maintenance); § 213.109 (prescribing crossties maintenance); § 213.113 (directing repair and replacement of defective tracks); § 213.115 (prescribing rail mismatch limits); § 213.121 (prescribing rail joint design and maintenance); and § 213.123 (mandating the proper use of tie plates under timber crossties). The foregoing regulations cumulatively and comprehensively address the subject matter of track maintenance and repair ... Because the Secretary's regulations directly

address the same subject matter that Plaintiff's state law negligence claim addresses, relevant case law deems that Plaintiff's negligence claim is preempted by the regulations. *See, e.g., Easterwood* … Accordingly, CN/IC is entitled to summary judgment on the negligence claim alleging a failure to maintain its track.

*Williams v. Amtrak*, 2006 U.S. Dist. LEXIS 86590, 8-9 (S.D. Ill. Nov. 29, 2006).

Furthermore, due to the presence of federal funding at the crossing, claims of improper or inadequate crossing inspection and maintenance are preempted by federal law. Where federal funds have been expended for warning devices at a grade crossing, state law tort claims alleging negligence in the inspection and maintenance of the crossing are preempted. *Bock v. St. Louis Southwestern Ry. Co.,* 181 F.3d 920, 922 (8th Cir. 1999), *cert. denied,* 529 U.S. 1086 (2000). An allegation that a crossing is "extra hazardous" or inadequately protected does not change this result. Preemption occurs once a federally funded warning device is installed and operational. BNSF conclusively establishes that the warning devices at this crossing were installed with federal funds. In 1988, the Cleburne Whitney Road crossing was designated in TXDOT's Project No. RRP 0000S(705) to participate in the 1988 Federal Railroad Signal Program, which would install automated crossing gates and new signal flashers at the crossing. The project participation breakdown of funding for these additions and upgrades to the subject crossing was 90 percent federal funds. The proposed 1988 federal crossing upgrade indicates that automated gate arms will be installed, as well as four new flashing signals east of the tracks and four new flashing signals west of the tracks. Bells would be installed at each of the signals as well. The proposed crossing upgrade was completed by BNSF and TXDOT and placed in service on January 26, 1990. The federally funded automated gates and flashers installed in 1990 have since been maintained by BNSF, and were maintained by BNSF, at the time of the May 11, 2008 accident. These federally funded gates and flashers properly activated prior to and at the time of the subject incident in excess of the minimum time required.

2.    **Amtrak and Morgan had no duty to properly inspect or maintain the crossing.**

Plaintiffs further claim that Amtrak and Morgan: (1) "failed to provide necessary and proper procedures," (2) "compelled Katelan Bailey Baker into entering the unsafe and dangerous crossing," (3) "failed to take precautions necessary to provide protection at the crossing," (4) "failed to properly inspect the crossing and take reasonable precautions to prevent individuals from placing themselves in harm's way," (5) "failed to take precautions necessary to alleviate the hazards of the dangerous trap presented by the crossing, when they knew or should have known of the crossing's dangerous nature," and (6) "failed to provide an adequate and unobstructed sight distance at its crossing."

Amtrak and Morgan, however, have no common law duties to properly inspect or maintain the crossing owned and operated by BNSF. *In re: Amtrak Sunset Limited Train Crash at Bayou Canot*, 188 F.Supp.2d 1341 (S.D. Ala. 1999). A railroad cannot be held liable for track safety where the railroad merely operates over tracks owned by another railroad, and the owning railroad has never delegated its duty of track maintenance, inspection, repairs, etc. *Id.* Plaintiffs provide no basis in statutory or common law to support these claimed duties owed by the operating passenger carrier and its engineer. Even if Amtrak and Morgan had the duties to inspect and repair the BNSF, such related negligence claims would still be preempted by the numerous specified federal regulations in 49 C.F.R. Part 213 which cumulatively and comprehensively address the subject matter of track maintenance and repair.

C.    **Defendants' compliance with federal regulations preempts Plaintiffs' failure to warn claims.**

Under the FRSA and the Highway Safety Act, when federal funds participate in the installation of the automated gates and lights at a crossing, claims related to signage, signalization, warnings and "hazardous conditions" are preempted. In this case, Plaintiffs allege that Defendants created a "hazardous condition" by failing to warn at its crossing. Plaintiffs' claim is preempted because it attempts to impose a greater duty upon Defendants in regard to a general condition at a crossing that is fully subsumed by both federal and state law. Since the

installation of the gates and arms at this crossing in 1989 and paid for with federal funds, neither TXDOT nor FHWA has considered or determined this crossing requires any additional or different safety and warning signs, signals or other devices. The undisputed evidence demonstrates that federal funding participated in the installation of the warning devices at the Cleburne Whitney Road crossing thereby triggering federal preemption of Plaintiffs' failure to warn claim. The United States Supreme Court stated that: Once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation "displace[s] state and private decision making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained. *Shanklin,* 529 U.S. 344 (2000) (citing *Easterwood,* 507 U.S. at 670). In this case, FHWA money was used to fund the crossing improvements and warning devices at this crossing and these improvements were made in accordance with 23 C.F.R. §§ 646.214(b)(3) and (4), the regulations that deal with the design and installation of new warning devices. As long as these protective devices were used and were in working order, Defendants did not have any duty to warn motorists or pedestrians of the presence of oncoming trains. Federal law sets the standards for what warnings are appropriate where federal funds are used. Therefore, Plaintiffs' claims that Defendants failed to warn the public of the conditions at the crossing is preempted pursuant to 49 USCS § 20106.

"[I]n 1971, and again in 1972, the Secretary [of Transportation] duly reported to Congress on the problem of grade crossings and on possible solutions. Congress responded by enacting the Highway Safety Act of 1973, [23 U.S.C. § 130]." *Easterwood,* 507 U.S. at 663. The Highway Safety Act (the "Act") is administered by the Federal Highway Administration ("FHWA") and provides federal funding to States to 21c "improve grade crossings, in return for which the States must 'conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.'" *Id., citing* 23 U.S.C. § 130(d). "Further conditions on the States' use of federal aid to improve grade crossings have been set out in

regulations promulgated by the Secretary through the [FHWA] under the FRSA and [the Act]."
*Id., citing* 23 C.F.R. Parts 646, 655, 924, and 1204 (1992). More pertinent to the present case,
the Act created the Federal Railway-Highway Crossings Program (the "Program"). *See* 23
U.S.C. § 130. Under the Program, funds were made available to the states for projects designed
to eliminate the hazards of railway-highway crossings. 23 U.S.C. § 130(a). The Secretary of
Transportation, acting through the FHWA promulgated regulations implementing the Program.
*See* 23 C.F.R. Part 646, Subpart B, "Railroad-Highway Projects." Specifically, 23 C.F.R. §
646.214(b), dictates the requirements for warning devices installed at grade crossings. For
crossings where gates and flashing lights are not required (*see* 23 C.F.R. § 646.214(b)(3)), "the
type of warning device to be installed, whether the determination is made by the State
regulatory agency, State highway agency, and/or the railroad, is subject to the approval of
FHWA." 23 C.F.R. § 646.214(b)(4). The specific regulations on warning devices required for
highway-railroad crossings, 23 C.F.R. §§ 646.214(b)(3) and (4), "establish requirements as to
the installation of particular warning devices," therefore, the *Easterwood* court held, these
regulations "cover the subject matter of state law," and, when they are applicable, state tort law
is preempted. *Easterwood,* 507 U.S. at 670-71. Once the FHWA provides federal funds and the
warning devices are installed and operational, section 646.214(b) "displace[s] state and private
decision-making authority by establishing a federal-law requirement that certain protective
devices be installed or federal approval obtained." *Id.* 507 U.S. at 670. Following *Easterwood,*
the majority of courts considering the issue treated the presence of federal funding as
establishing preemption: The participation of federal funds "in the installation of … warning
devices legally presupposes that the Secretary approved and authorized that expenditure,
which in turn legally presupposes that the Secretary determined that the safety devices installed
were adequate to their task." *Hester v. CSX Transp., Inc.,* 61 F.3d 382, 387 (5th Cir.), *cert.
den'd* 516 U.S. 1093 (1996) (inadequate signalization claim preempted). The participation of
federal funds is the "touchstone of preemption … because it indicates that the warning devices
have been deemed adequate by federal regulators." *Elrod v. Burlington N. R. R. Co.,* 68 F.3d

241, 244 (8th Cir. 1995). In *Shanklin,* the United States Supreme Court granted certiorari "to resolve a conflict among the Court of Appeals as to whether the FRSA, by virtue of 23 C.F.R. §§ 646.214(b)(3) and (4) (1999), preempts state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds have participated in the installation of the devices." 529 U.S. at 351-52. The Court, reversing the Sixth Circuit Court of Appeals, held that federal funding of a project to install warning devices at a grade crossing is sufficient to trigger federal preemption of a state law negligence claim premised on inadequate warning devices. It is the presence of federal funding that displaces the state law claims "and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the MUTCD[.]" 529 U.S. at 357-358. "Whether the State should have originally installed different or additional devices, or **whether conditions at the crossing have since changed** such that automatic gates and flashing lights would be appropriate, **is immaterial to the pre-emption question.**" *Id.* (emphasis added). Since *Easterwood,* courts have considered and consistently found federal preemption of plaintiffs' negligence claims of inadequate warning devices, "hazardous conditions," and maintenance of railroad crossings in highway-railroad crossing accidents where federal funding is present.

Plaintiffs allege that Defendants are at fault because motorists at the crossing did not have adequately visibility, including an adequate sight distance at the crossing. These claims should be rejected. The use of federal funds is the equivalent of federal approval of the adequacy and safety of the crossing, and therefore, federal preemption applies. *Burlington N. R.R. v. Deatherage,* 1997 U.S. Dist. LEXIS 9886 (D. Miss. 1997). In particular, when federal funding is used at a crossing, "factors such as limited sight distance, high speed train operations, and prior accidents" do not preclude preemption of common law negligence claims. *Id.* Even severe or unusual limitations on sight do not trump the preemptive force of the FRSA where federally funded crossings are involved. For example, in *Gunn v. Atchison, Topeka & Santa Fe Ry. Co.,* 13 S.W.3d 52, 55 (Tex. App. 1999), the Texas Court of Appeals found preemption despite the limitations on sight of the train where the tracks crossed the road at a 61

degree angle, which required a motorist driving south to turn his head more than 90 degrees to check to his right; there was a parallel road in close proximity; and there were two tall trees within 55 feet of the track. The Court found that these were merely general conditions of crossings accounted for in the Secretary of Transportation's regulations and determined that they did not obscure or interfere with devices signaling the crossing. 13 S.W.3d at 55-56. Here, there were no obstructions that precluded a motorist from seeing the obvious flashing lights and signalization arms at the crossing. The federal government found the signalization and warnings at this crossing to be acceptable, despite any conditions hampering the sight of pedestrians that plaintiff claims exist at the crossing. Therefore, preemption of this claim is appropriate.

### 1.    BNSF complied with 23 C.F.R. section 646.214(b).

Plaintiffs claim that BNSF: (1) "failed to provide necessary and proper procedures," (2) "compelled Katelan Bailey Baker into entering the unsafe and dangerous crossing," (3) "failed to warn Katelan Bailey Baker of a known defect in the unsafe condition," (4) "failed to take precautions necessary to provide protection at the crossing," (5) "failed to take precautions necessary to alleviate the hazards of the dangerous trap presented by the crossing, when they knew or should have known of the crossing's dangerous nature," (6) "failed to provide an adequate and unobstructed sight distance at its crossing," (7) "failed to comply with applicable guidelines, rules, and their own internal policies for appropriate warning devices at railroad crossings," (8) "created and maintained an extrahazardous railroad crossing at BNSF crossing #023161K," and (9) "failed to take any corrective action to prevent a recurrence of" similar past events.

These failure to warn claims, however, are preempted by federal law, because BNSF complied with 23 C.F.R. section 646.214(b), which was promulgated under the regulatory authority granted by the FRSA. Once a state installs warning devices at a grade crossing using federal funds, these type of regulations governing warning devices establish a federal standard for the adequacy of those devices which preempts state tort law on the same subject. *Shanklin,* 529 U.S. at 352-53, 357-58. These regulations implement the Federal Rail-Highway Crossing

Program, which makes each state responsible for evaluating every grade crossing for potential hazards, ranking each crossing in terms of risk, and implementing appropriate improvement projects. 23 U.S.C. § 130(d); *see also Shanklin*, 529 U.S. at 348. Once a State installs the warning device at a grade crossing using federal funds, the federal regulations "establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject." *Shanklin*, 529 U.S. at 357.

BNSF conclusively establishes, as previously set forth in Paragraph II-B-(1), *supra*, that the warning devices at this crossing were installed with federal funds. Because BNSF conclusively establishes the signals and warning devices were federally funded, Plaintiffs' claims related to inadequate signalization are preempted.

### 2. Amtrak and Morgan complied with their duty to warn.

Plaintiffs claim that Amtrak and Morgan: (1) "failed to provide necessary and proper procedures," (2) "compelled Katelan Bailey Baker into entering the unsafe and dangerous crossing," (3) "failed to warn Katelan Bailey Baker of the unsafe condition," (4) "failed to sound the train's whistle, siren or horn" and (5) "failed to comply with applicable guidelines, rules, and their own internal policies for appropriate warnings at railroad crossings."

These claims relating to Amtrak's and Morgan's duty to warn are preempted, however. Federal regulations cover the subject matter of "audible warning devices" that includes sounding the locomotive horn. FRA regulations generally require locomotive engineers to sound train horns for a minimum of fifteen seconds, and a maximum of twenty seconds, in advance of all public grade crossings. 49 C.F.R. § 222.21 (2005). Additionally, trains "traveling at speeds in excess of 45 mph shall not begin sounding the horn more than one-quarter mile (1,320 feet) in advance of the nearest public highway-rail grade crossing, even if the advance warning provided by the locomotive horn will be less than 15 seconds in duration." *Id.* at § 222.21(b)(2). These regulations are intended to "preempt any State law, rule, regulation, or order governing the sounding of the locomotive horn at public highway-rail grade crossings, in accordance with 49 U.S.C. 20106." *Id.* at § 222.7(a). To establish a material issue of fact as to Defendant's

noncompliance with the federal standard, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586-87.

Federal courts uphold preemption of failure to warn claims. In *Gillenwater v. Burlington Northern and Santa Fe Railway Co.*, 435 F.Supp.2d 959 (E.D. Mo. 2006), the court reiterated that "complete preemption precludes claims of negligent blowing of the locomotive horn as well as audibility of the horn by virtue 49 C.F.R. § 221.21 and 49 C.F.R. § 229.129." Furthermore, Plaintiff bears the burden of proving that the horn did not meet the FRA standard at the time of the accident. *Robinson v. Norfolk Southern Corp.*, 2003 U.S. Dist. LEXIS 11997 (E.D. La. July 10, 2003). The undisputed evidence shows that Engineer Morgan properly sounded the train's audible whistle and bell approximately beginning 1,664 feet and fifteen seconds south of the subject crossing and continued to sound the whistle and horn until the locomotive occupied the subject crossing. This application of the locomotive's horn/bell complied with 49 CFR 222.21. The train's headlight and ditch lights were properly illuminated as the train approached the crossing. The Amtrak train was traveling at approximately 75 miles per hour immediately prior to the collision. No slow order had been issued for the Cleburne Whitney Road crossing area. The train's speed complied with the BNSF timetable speed limit of 79 miles per hour for a passenger train at this location, and below the federally mandated speed limit for operation on Class 4 track (80 miles per hour maximum passenger train speed per 49 CFR Part 213.9(a)). Yellow advance warning signs located along the southbound side of Tower Road and the westbound side of Cleburne Whitney Road alerted motorists of the presence of a railroad crossing. K.B.B. operated the 2003 Chevrolet Trailblazer westbound toward the Ceburne Whitney Road crossing as the train approached the crossing. K.B.B. proceeded around the activated horizontal gate and into the path of the approaching train. Engineer Morgan initially believed that the automobile would be able to clear the train's path prior to the collision. The train was approximately 400 to 500 feet and about 3-4 seconds south of the crossing when Engineer Morgan concluded that a collision was imminent, and she therefore applied the train's brakes. Even had Engineer Morgan placed the train's brakes in emergency at 600-800 feet and 6-8 seconds south of reaching the

crossing, when K.B.B. clearly had ample opportunity to get out of the way, the train's delay at arriving at the crossing would have been less than one second and the speed would still have been over 70 mph at impact. The automobile did not clear the train's path before the train reached the crossing, resulting in a collision.  In order to have stopped the train completely prior to reaching the Cleburne Whitney Road crossing, Engineer Morgan would have had to apply the train's emergency brake approximately seventeen seconds and 1,900 feet south of the subject crossing, which would have been before K.B.B. had approached the crossing. Engineer Morgan first saw the vehicle when the train was near the whistleboard, about 1,300 feet south of the crossing. Even had Engineer Morgan placed the train's brakes in emergency at 600-800 feet and 6-8 seconds south of reaching the crossing, when K.B.B. clearly had ample opportunity to get out of the way, the train's delay at arriving at the crossing would have been less than one second and the speed would still have been over 70 mph at impact.

**D.    Defendants' compliance with federal regulations preempts Plaintiffs' failure to slow claims.**

Nearly every court that has addressed a state law claim based on excessive speed or a failure to slow down has held that such claims are preempted. *Johnson v. Union Pac. R.R.*, 2003 U.S. Dist. LEXIS 26881, 20-21 (E.D. Tex. Nov. 20, 2003); *See O'Bannon v. Union Pac. R.R. Co.*, 960 F. Supp. 1411 (W.D. Mo. 1997) (inadequate warning devices, grade/angle of crossing, proximity to highway), aff'd, 169 F.3d 1088 (8th Cir. 1999); *Wright v. Illinois Cent. R.R. Co.*, 868 F.Supp. 183, 187 (plaintiff's argument regarding vegetation, grade, and angle of crossing creating a local hazard, if accepted, would swallow the intent of preemption); *see also Williams v. Alabama Great Southern R. Co.*, 1994 U.S. Dist. LEXIS 11024, 1994 WL 419863, *2 (E.D. La. 1994) (presence of fog and brick facility); *Earwood v. Norfolk Southern Ry. Co.*, 845 F. Supp. 880, 888 (N.D. Ga. 1993) (congested intersection, impaired visibility). Even if these claims were not preempted, Plaintiffs present no evidence showing that Defendants' alleged failure to slow, brake and/or excessive speed proximately caused K.B.B.'s death and Plaintiffs' subsequent damages.

1.      **BNSF had no duty to slow.**

Plaintiffs claim that Defendant BNSF failed to slow and/or stop the train to avoid a specific individual hazard. BNSF, however, had no duty to slow or stop the train, even were a specific individual hazard present. There is no statutory or commonly duty owed by the crossing's owner to slow or stop the train to avoid a specific individual hazard.

2.      **Amtrak and Morgan complied with 49 C.F.R. § 213.9.**

Plaintiffs claim that Amtrak and Morgan: (1) "failed to keep a proper lookout," (2) "Defendant Amtrak and Defendant Morgan failed to slow and/or stop the train to avoid a specific individual hazard," (3) "failed to take precautions necessary to alleviate the hazards of the dangerous trap presented by the crossing when they knew or should have known of the crossing's dangerous nature," (4) "failed to make a timely application of the brakes," and (5) "failed to stop the train to avoid the collision." Plaintiffs further allege that "the speed of the train" contributed to the death of K.B.B.

However, Plaintiffs claims related to Amtrak's and Morgan's alleged failure to slow and excessive speed are preempted by federal law, because the subject passenger train in this case was traveling at a speed less than the maximum speed allowed under Section 213.9. Under 49 C.F.R. § 213.9, the maximum speed allowable for a passenger train traveling on a Class 4 track is 80 mph. *Id.* The Amtrak train was traveling at approximately 75 miles per hour immediately prior to the collision. No slow order had been issued for the Cleburne Whitney Road crossing area. The train's speed complied with the BNSF timetable speed limit of 79 miles per hour for a passenger train at this location, and below the federally mandated speed limit for operation on Class 4 track (80 miles per hour maximum passenger train speed per 49 CFR Part 213.9(a)).

The event recorder download data interpreted by Foster J. Peterson show that the train was traveling at 75 mph on a Class 4 track just prior to the collision when Engineer Morgan applied the train's brakes. Because the summary judgment evidence shows the train was operating in compliance with the federal regulation governing train speed, Plaintiffs cannot show that the train was operating at an excessive speed. A violation of this regulation is required for

Plaintiffs to except their negligence claims based on this theory from federal preemption under 49 U.S.C. § 20106 and the included Preemption Clarification. *Gauthier v. Union Pac. R.R. Co.*, 644 F. Supp. 2d 824, 838 (E.D. Tex. 2009). Amtrak operated its train in accordance with the federal regulation regarding speed, and as such, Plaintiffs' excessive speed claim should be preempted.

"Although railroad trains may not have an absolute right of way at grade crossings under all condition, there is no duty on the part of the engineer operating the train to yield the right of way until the situation is such as to indicate to a reasonably prudent person that to proceed would probably result in a collision. At that time it becomes the duty of the engineer to exercise ordinary care to avoid an accident, even to the extent of yielding the right of way." *Wyatt v. Burlington Northern, Inc.*, 306 N.W.2d 902 (Neb. 1981). In *Wyatt*, the Court held that the railroad was not negligent nor the proximate cause of the plaintiff's accident where the train was being operated at a reasonable rate of speed and, when the train crew realized that the motorist was not going to stop, the crew placed the train in "emergency" in an effort to avoid the accident.

Importantly, Plaintiffs' allegation that K.B.B. constituted a "specific individual hazard" does not except the application of federal preemption regarding their failure to slow and excessive speed claims. There is no dispute in this case that the track over which the train was traveling approaching the crossing is Class 4 track. The maximum speed set by 49 C.F.R. 213.9 for passenger trains over Class 4 track is 80 mph. Because the area of speed regulation is controlled by federal law, Plaintiffs' allegations of speed are preempted unless the crossing was a "specific, individualized hazard." *Easterwood*, 507 U.S. at 675 n 15. Courts have recognized that, "given the clear direction of Congress and the FRA, it is apparent that [a p]laintiff bears a heavy burden in seeking to establish a [specific, individualized hazard]. This ensures that the policies advanced by preemption remain in force. Otherwise, the exception will swallow the rule. Railroads will be forced to cobble together a patchwork of train speeds, reacting to every crossing that involves some peculiarity or has some accident history." *Largo v. Atchison, Topeka and Santa Fe Ry. Co.,* 131 N.M. 621, 628-29, 41 P.3d 347, 354-55 (N.M. App. 2001). In

*Armstrong v. Atchison, Topeka & Santa Fe Railway Company,* 844 F. Supp. 35 1152, 1153 (W.D. Tex. 1994), the court stated that the "specific, individual hazard' identified by the *Easterwood* court logically relates to the avoidance of a specific collision, and held that claims based on the failure to slow or stop while approaching a dangerous grade crossing in a high traffic area were preempted by federal law. However, the crew cannot be liable for failure to keep lookout if there is no showing that the train could have been stopped in time to avoid collision. *Baldwin v. Atchison, Topeka & Santa Fe Railway Co.,* 425 S.W.2d 905 (Mo. 1968). To support the theory of failure to keep a proper lookout, there must be evidence that Defendant saw or could have seen Plaintiff in time to have avoided the collision. *Jenkins v. Jordan*, 593 S.W.2d 236 (Mo. App. 1979). Unless at the moment the crew had a duty to keep a proper lookout, the train could have been sufficiently slowed or stopped in time to avoid the collision, the failure to keep a lookout is not the proximate cause of the injury. *Lovett v. Union Pacific R.R. Co.*, 201 F.3d 1074 (8th Cir. 2000). In order to have stopped the train prior to reaching the Cleburne Whitney Road crossing, Engineer Morgan would have had to apply the train's emergency brake approximately seventeen seconds and 1,900 feet south of the subject crossing, which would have been before Morgan had seen the Trailblazer. Engineer Morgan first saw the vehicle when the train was near the whistleboard, about 1,300 feet south of the crossing. Even had Engineer Morgan placed the train's brakes in emergency at 600-800 feet and 6-8 seconds south of reaching the crossing, when K.B.B. clearly had ample opportunity to get out of the way, the train's delay at arriving at the crossing would have been less than one second and the speed would still have been over 70 mph at impact.

### E.   BNSF and Amtrak's compliance with federal regulations preempts Plaintiffs' inadequate training claims.

Plaintiffs claim that Defendants BNSF and Amtrak failed to adequately train their employees. Such claims, however, are preempted by federal law. For instance, a state-law claim in grade crossing collision case that engineer-trainee was inadequately trained and instructed is preempted on the basis of 49 C.F.R. § 240.1, *et seq. Thompson v. Northeast*

*Illinois Regional Commuter R. Corp.*, 854 N.E.2d 744 (Ill. App. 2006); *Sheppard v. Union Pac. R. Co.*, 357 F.Supp.2d 1180 (E.D. Mo. 2005); *Kohn v. Norfolk Southern Corp.,* 1998 U.S Dist. LEXIS 22222 (N.D. Ind. No. 1998). *See also, Burlington Northern and Santa Fe Ry. Co. v. Doyle,* 186 F.3d 790 (7th Cir. 1999) (state's crew qualification requirements are preempted by 49 C.F.R. Part 240 and 49 C.F.R. § 217.11(c); *Miciotto v. Brown*, 2005 U.S. Dist. LEXIS 11994 (E.D. La. May 24, 2005); *Gould v. Norfolk Southern Corp.*, (S.D. Ind. 1988) (Inadequate training of locomotive crew (student engineer) preempted by 49 C.F.R. § 240.1, et seq.*).* Even if the court holds that inadequate training claims are not preempted, Plaintiffs present no evidence, and there is no genuine issue of material fact, as to whether the alleged failure to train proximately caused K.B.B.'s death and Plaintiffs' subsequent damages.

## III.   PLAINTIFFS' AND DECEDENT'S CONTRIBUTORY NEGLIGENCE BARS ALL CLAIMS AGAINST DEFENDANTS.

The evidence in this case is that decedent's negligence is equal to or exceeds any alleged negligence of Defendants, and therefore bars Plaintiffs' recovery on all of their claims. Texas' comparative negligence law in Texas Civil Practice and Remedies Code section 33.001 provides that the plaintiffs' claims will be barred when the plaintiffs' negligence is equal to or exceeds the negligence of the defendant.  Contributory negligence is conduct on the part of the plaintiff amounting to a breach of the duty which the law imposes upon persons to protect themselves from injury and which, concurring and cooperating with actionable negligence on the part of the defendant, contributes to the injury complained of as a proximate cause. K.B.B. was negligent *per se*, when she violated Texas Transportation Code section 545.251 and drove around the activated railroad crossing gates. K.B.B. proceeded around the activated horizontal gate and into the path of the approaching train. A motorist has a statutory duty to yield to oncoming trains. Texas Transportation Code section 545.251 provides, in part, that when a motorist approaches a railroad grade crossing, she shall:

(a)  … stop not closer than 15 feet or farther than 50 feet from the nearest rail if:

(1)  a clearly visible railroad signal warns of the approach of a railroad
train;

(2)  a crossing gate is lowered, or a flagger warns of the approach or passage of a train;

(3)  a railroad engine approaching within approximately 1,500 feet of the highway crossing emits a signal audible from that distance and the engine is an immediate hazard because of its speed or proximity to the crossing;

(4)  an approaching railroad train is plainly visible to the operator and is in hazardous proximity to the crossing;  or

(5)  the operator is required to stop by:
    (A)  other law;
    (B)  a rule adopted under a statute;
    (C)  an official traffic-control device;  or
    (D)  a traffic-control signal.

(b)  An operator of a vehicle required by Subsection (a) to stop shall remain stopped until permitted to proceed and it is safe to proceed.

*   *   *

(d)  An operator commits an offense if the operator drives around, under, or through a crossing gate or a barrier at a railroad crossing while the gate or barrier is closed, being closed, or being opened.

(e)  In a prosecution under this section, proof that at the time of the offense a train was in hazardous proximity to the crossing and that the train was plainly visible to the operator is prima facie evidence that it was not safe for the operator to proceed.

The undisputed evidence shows that K.B.B. operated the vehicle in violation of the restrictions provided with her hardship license, limiting her driving to Mondays through Fridays. K.B.B. possessed a Texas hardship license at this time. K.B.B.'s hardship license restricted her driving to Mondays through Fridays, 7:15 a.m. to 3:45 p.m. Plaintiff Cassie Baker was aware that K.B.B. would be operating the motor vehicle alone while traveling to the food center and had authorized her to do so. The evidence that K.B.B. operated her vehicle around the activated crossing gates, as well as her parents' permitting her to operate the vehicle in violation of the restrictions provided by Texas law, constitute sufficient evidence that no reasonable or fair minded juror would place less than 50 percent negligence upon K.B.B. and/or her parents.

IV.     **PLAINTIFFS' CLAIMS FOR GROSS NEGLIGENCE AND PUNITIVE/EXEMPLARY DAMAGES ARE UNFOUNDED.**

Finally, Plaintiffs seek punitive damages. To recover exemplary damages under Texas law, a plaintiff has the burden of proving by clear and convincing evidence that the harm resulted from (1) fraud; (2) malice; or (3)  willful act or omission or gross neglect. TEX. CIV. PRAC. & REM. CODE § 41.001 *et seq.* "Gross negligence" is defined as (B) an act or omission: (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others *Id.* at § 41.001(7)(B). Plaintiffs offer no evidence that Defendants had an objective awareness of any extreme risk to K.B.B. or subjective awareness of extreme risk to K.B.B. Even viewing the evidence in the light most favorable to Plaintiffs, this court should find that no genuine issues of material fact exist as to Plaintiffs' claim for exemplary damages. *Johnson v. Union Pac. R.R.,* 2003 U.S. Dist. LEXIS 26881, 40-41 (E.D. Tex. Nov. 20, 2003). Assuming for purposes of this motion that Defendants breached any of the duties owed to K.B.B., Plaintiffs have not presented clear and convincing evidence that Defendants possessed objective and subjective awareness of the risk to K.B.B., but nevertheless proceeded with cautious indifference. Therefore, this court should strike Plaintiffs' claims for exemplary damages.

## CONCLUSION

Defendants' summary judgment should be granted because each of Plaintiffs' claims is preempted by federal law. Even more, Plaintiffs' and decedent's contributory negligence bars

their recovery against Defendants. Finally, Defendants conclusively proved there is no genuine issue of material fact as to any duty owed to decedent and that Defendants are therefore entitled to judgment as a matter of law.

### PRAYER

Defendants request that the court grant its summary judgment on all of Plaintiffs' claims. In the alternative, Defendants' request the court grant summary judgment as to those claims the court believes Defendants' have shown themselves entitled, thus identifying any remaining fact issue that must be determined by a jury.

Respectfully submitted,

Robert B. Burns, Jr.
Attorney-in-Charge
State Bar No. 03450400
bburns@bajb.com
Juliana C. Griggs
State Bar No. 24041011
jgriggs@bajb.com
BURNS ANDERSON JURY & BRENNER, L.L.P.
P.O. Box 26300
Austin, TX 78755-6300
512-338-5322
512-338-5363 (Telecopier)
**ATTORNEYS FOR DEFENDANTS,
BNSF RAILWAY COMPANY, NATIONAL
RAILROAD PASSENGER CORPORATION,
AND VELIDA J. BREAKFIELD**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been forwarded in accordance with Federal Rules of Civil Procedure 5, this 27th day of April, 2010.

**VIA FACSIMILE: 817.275.4106**
Jim R. Ross, Attorney in Charge
JIM ROSS & ASSOCIATES, P.C.
420 E. Lamar Blvd., Suite 110
Arlington, TX 76011

**VIA FACSIMILE:  817.467.3432**
Roger E. Bishara
LAW OFFICES OF ROGER E. BISHARA, P.C.
2000 E. Lamar Blvd., Suite 600
Arlington, TX 76006

**ATTORNEYS FOR PLAINTIFFS, CASSIE LEA BAKER AND BAILEY EUGENE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES OF K.B.B., DECEASED MINOR**

Robert B. Burns Jr.
Juliana C. Griggs

## APPENDIX

All of the following summary judgment proof is incorporated by reference into Defendants' Motion for Summary Judgment and Brief in Support Defendants' Motion for Summary Judgment:

| TAB | Description |
|-----|-------------|
| 1 | Affidavit of Tim Huya (appendix pages 1-33) |
| 2 | Affidavit of Dan Fisher (appendix pages 34-44) |
| 3 | Affidavit of Sgt. Mike D. Pruitt (appendix pages 45-54) |
| 4 | Affidavit of Foster Peterson (appendix pages 55-66) |
| 5 | Affidavit of Mark Degano (appendix pages 67-71) |
| 6 | Affidavit of Ricky Carmack (appendix pages 72-76) |
| 7 | Deposition– Velida Morgan (appendix pages 77-92) |
| 8 | Deposition– Ricky Carmack (appendix pages 93-113) |
| 9 | Deposition– Brett Anderson (appendix pages 114-125) |
| 10 | Plaintiff Cassie Lea Baker's Interrogatory Answers (appendix pages 126-132) |
| 11 | Plaintiff Bailey Eugene Baker's Interrogatory Answers (appendix pages 133-139) |
| 12 | Plaintiffs' Cassie Lea Baker and Bailey Eugene Baker's Request for Production Responses (appendix pages 140-146) |
| 13 | Excerpts from Plaintiffs' Initial Disclosures (appendix pages 147-153) |
| 14 | Deposition– Edward Delao (appendix pages 154-159) |